Good morning, Your Honors. I'm John Huster, appearing for the appellants, the Hylers. This case stems from a loan, two loans that were made to the Hylers in 2004. Following those loans, the defendants were investigated by the Department of Real Estate in California and entered into a plea bargain whereby they admitted that one of these two loans, a $100,000 loan made to the Hylers, violated California's equivalent of TILA, California Financial Code 4970, admitting that that loan was a consumer loan and had excessive interest and points and escalation clauses. There was also a $1.2 million loan made essentially simultaneously with that $100,000 loan. That $1.2 million loan became the subject of a TILA action, which is this lawsuit. That admission to the Department of Real Estate was made on July 6th of 2007 by defendants. Then the Hylers brought a TRO application to stay a foreclosure of their home brought by defendants, and that was in July. And during the pleading stages and at oral argument, the defendants represented to the court and to the Hylers that they never entered into consumer loans, that they only enter into business loans. And that's why we know the $1.2 million loan doesn't violate TILA, because we only do business loans. Well, to set this, though, in context, we're really what you're talking about a 60B3 motion to set aside a judgment, right? Yes. And an argument that to set it aside on the grounds that the consideration is illegal. And so following that hearing, the Hyler defendants make these representations that they never enter into consumer loans when, in fact, they had previously admitted that the loan to the Hyler, one of the two loans, was, in fact, a consumer loan. Then the TRO hearing goes very badly for the Hylers. They get a large bond that they have to meet. They can't meet it. Their house was foreclosed two weeks later on July — I'm sorry, August 15th. And then they enter into a settlement agreement to try to stay in their home on August 31st with the defendants, whereby they agree to pay off both loans, all interest, everything. Now, we're arguing that, one, it should be set aside on the grounds of fraud, and, two, that the consideration was illegal. I'd like to first address the illegality argument, because I think it's actually very straightforward, but it became somewhat confused in the pleadings. The McIntosh case cited in our briefs, 121 Calop 4th at 343, clearly states that the standard for review when determining whether or not the illegality doctrine applies is a question of law that we must decide, quote, de novo. So it's de novo review. In that case, the Court was dealing with a fee-sharing agreement, where the attorney was trying to set aside a fee-sharing agreement with a nonattorney that he knew violated the rules of professional conduct, and the Court still set it aside on public policy considerations, applying Civil Code section 1608 that says where any part of the consideration is illegal, the entire agreement should be void as unenforceable. And the Court – I'd like to actually quote from the Court at page 346. They said, Here, the Hilers didn't know it. That's kind of irrelevant, because in the McIntosh case, the plaintiff, the appellant, knew the fee-sharing agreement was illegal. He was an attorney. But they still found it unenforceable because the consideration was illegal. It was a statutory violation. Here, there was a statutory violation. Defendants admitted that the $100,000 loan violated California Financial Code 4970. There's a strong public policy in California and the Federal public policy of TILA prohibiting these excessive loans to consumers. Defendants admitted it was a consumer loan. They then forced it into the settlement agreement. They made it part of the settlement agreement, and the Hilers paid off the entire balance, plus all interest, on both loans. Now, defendants say, well, then you could never settle a TILA case if this is the illegal consideration. And that's simply not true. They could have settled the disputed portion. They could have settled the $1.2 million claim, because IGL didn't admit that that was a consumer loan. That was still in dispute. So that was a disputed issue that could be subject to a settlement agreement. But IGL knew. They admitted the $100,000 loan violated California Financial Code. And that's where they were excessive and greedy. And by including that loan in the settlement agreement, they overstepped. And there should be a public policy that if you try to put those kind of things in a settlement agreement that are clearly illegal, it's going to be set aside. The consideration is valid. It's an illegal consideration. The consideration for the settlement? Right. The payment of illegal interest that violates the California Financial Code. Now, on the issue of fraud, I'd like to jump to the Court's decision. They said that there was absolutely no factual misrepresentation. It was mere puffery. It was just legal posturing. Now, I'll read from the Gillespie case that's quoted in our brief. I didn't quote this, but the case is quoted at page 527, 528. It defines fraud. It's a really applicable definition. Quote, Thus, it is a rule of general application in dealing with the question of false representations that one who speaks is not only obligated to tell the truth, but he is equally bound not to suppress or conceal any facts within his knowledge which materially qualify those stated citations. If he speaks at all, he must make a full and fair disclosure. So when they spoke and said, we only make consumer loans, that's not mere puffery. I mean, we only make business loans. We never make consumer loans. That's a statement of fact. And when you make that statement of fact, you have to qualify it with the facts that are known, that we have just admitted that we, in fact, made a consumer loan. Now, what date was that on? That hearing where that statement is made is August 1, 2007. The pleadings filed that also make those statements are on July 25 of 2007. The admission signed by the president of IGL was on July 6, 2007. All right. Now, your settlement was August 31 of 2007, right? Correct. So why couldn't you discover the fraud prior to settling, if in fact it was? This was all happening very fast. So the stipulation didn't become effective until August 23. So that's when it's filed and entered by the Department of Real Estate. That's still before you settled. Right. So like I said, this is happening very fast. July 6 is when – is it possible? It's conceivably possible. Is it reasonably – would it be? But isn't all that what the Court is supposed to consider in connection with the 60B? With the 60B, yes, not with the illegality argument. But the question is, with due diligence, would it reasonably be discovered? But isn't that for the trial court to determine under the applicable standard and for us to evaluate under an abusive discretion standard? Yes, Your Honor, it is. And I think it would be an abusive discretion to say that this would be discovered through reasonable diligence, where you basically had a two-week window to discover this before your house is foreclosed. And then you're in foreclosure and you're struggling to figure out a way to save  You're getting threatened with eviction. And you're putting your effort into doing this TRO application, trying to get financing, all these things, and it's defendant who's hiding this. They should not get away with their fraud because of this short window where they're threatening foreclosure in this atmosphere and be allowed to get away with their fraud by saying, well, you could have discovered it. You had a whole two or three weeks where you could have discovered it. Instead, they should have told the truth. When they came into court and said, we never make consumer loans, when they had entered into a stipulation, a plea bargain with the Department of Real Estate where they said, we made a consumer loan to the Heilers, they should have said that. They should have came into court and said, we never make consumer loans, but we did make one to the Heilers. Now, if they had done that, I think things would have gone very differently, and certainly the Heilers wouldn't have entered into a settlement agreement where they paid — were agreeing to pay $2.1 million, where the principal they were paying off was only $1.3 million. They were paying $800,000 to IGL over the principal that they borrowed. You have about a minute left if you want to reserve some time. I would like to reserve the rest of my time, Your Honor. You may. Good morning, Your Honor. Michael Stone for the Respondents. I'm reluctant to go over all the facts against this. It seems to me the standard of review on this is not de novo, as appellants have been urging, that there's all kinds of — in fact, they stated in their first issue, I believe, that Judge Alsop or the district court declined to exercise his discretion. So he did exercise his discretion. He made it clear what his findings of fact were. I quoted them in my reply brief, and I don't want to be redundant about that. It seems to me that this Court has to decide whether or not he abused his discretion. Was he clearly in error? And Judge Alsop was the one who heard the order — the temporary restraining order motions. He knows what the basis of his decision or — it wasn't even a decision in that case. In that instance, it was an opinion that this looks to me to be a business loan. Then when appellants came back with a motion to set aside the dismissal that was based on the settlement agreement, he told them that when they said — they made this statement in court, and we don't think it's right. And I'll talk about why they don't think it's right and what my client understood, and there was no misrepresentation. But the Court told them right at that time. When I made that statement, I didn't put much weight on counsel's representation. There was no misconduct. There was no misstatement by counsel. I looked at the application that was submitted or the letter from the broker. I looked at what the intended purpose of the loan was, and it looks to me like this is going to be a business loan. The part that the judge or the tribunal that is in best position to understand what he relied on when he made that statement, and that statement somehow influenced them to get into the settlement agreement, was the district court that declined to set aside the settlement agreement. He exercised his discretion. He listened to all their arguments, and then he made specific facts. And it seems to me we don't have to go any further than that. Well, if we — if we considered this to be a misrepresentation, we three, would that be a ground for reversal of the trial court under 60B? You may disagree with the judge, but I don't think that would be a ground for reversal unless he was clearly in error. There was a basis for his finding. He had the discretion to hear that, because he's the one that — he's the one that saw Mr. Hyler. He's the one that's heard the arguments before by prior counsel. And with all deference to Mr. Huster, I've dealt with six different counsel representing Mr. Hyler. He wasn't even there when the original arguments were made in court at that time. That was their third counsel that would be dealt with when they tried to restrain the foreclosure. And it was only after the foreclosure went through. By the way, I want to jump ahead. I'm going to get myself all screwed up here, and I apologize. But Judge Alsup did not find that there were — a bond was going to be $835,000 because there was a probability of prevailing on our claim that it was a business loan. If the Court looks at the excerpt, what he said was, I think this is going to be a business loan. Nevertheless, I understand how important this is to Mr. Hyler and the threat of being sent home. So I'm going to — I have to order a bond, and I'm going to make the bond only the amount that you concede you would owe if you win all your Tyler claims. You won't owe the whole $1.3 million that they're claiming. You conceded that you would owe it $835,000. So they actually prevailed at the restraining order hearing. They got their restraining order, and all they had to put up was a bond for the amount they admit that someday they're going to have to pay. And they refused to do that. And when they didn't do that, we went ahead with a foreclosure. And it was to get the option to buy the property back that they settled. They didn't settle because of anything that was said at the restraining order hearing. It was because they wanted a chance to buy it back once again. Mr. Hyler thought he could get somebody to finance his estate for $7 million, and then he put up $100,000 to get 60 days to do that. It had nothing to do with it. There's a dispute between counsel as to, in my reply brief, where I keep referring to Mr. Hyler's alleged reliance on my client's understanding, and my client didn't really have that understanding, that he only did business loans. And he claims that I've misstated the whole thing about Mr. Hyler. But I wanted to, before I run out of time, refer the Court to excerpt page 112 and lines 2 through 7. And this is a quote right from the supporting declaration for the motion to set aside the settlement and the dismissal order. And this is Mr. Hyler's talking. Now, he's saying what he relied on was our understanding that we only made business purpose loans, which is exactly what I was arguing in the reply. That's a pretty subjective thing. And if you're going to claim that's part of the reason you're in the settlement agreement, per the terms of the settlement agreement, that's got to be in there. And it was not. I was not trying to mislead this Court into getting off on belief versus a misstated fact. Ginsburg. What the district court said was the evidence of plaintiff's fraud. I'm sorry. I'm sorry. But the district court said when there was the motion to undo the settlement because of fraud, what the district court said was the essence of plaintiff's fraud claim is that defendant's advocacy in the Tila case discouraged their resolve and led them to settle. This was not fraud. No fact was misrepresented. At worst, defendant made a legal argument about the facts that was incorrect. Fraud requires more. Is that? That's my point, yes. That was the Court's exercise of their discretion. He felt that that's the real basis, and that he didn't feel there was any fraud or misconduct, even if that had influenced his decision to set the bond and what it did. But then he went on to tell them that, as a matter of fact, I didn't put much weight on that representation to begin with. Okay. I urge this Court, but the one other point that Mr. Hooster made about illegal consideration. First of all, consideration was the option that he was given and had for 60 days. In fact, he ended up renewing that with a second agreement. So he had about a year to repurchase his house. That was the consideration of the settlement agreement. The settlement agreement set forth a price of $2.1 million. Mr. Hooster is arguing that there was illegal charges in there because of this DRE settlement agreement or plea bargain. And that's just not the case. And not only is there no evidence before the district court or this Court that any of those settlement or finance charges were included in that $2.1 million, it is to the contrary. Mr. Hiler's first lawsuit was filed before I was even involved, challenging all the settlement, all the finance charges of that $100,000 loan within six weeks after he made the loan. And in that particular settlement, or in that case, all the finance charges were reversed as a settlement before it ever got to the pleading stage. Okay. So that 2.1 just doesn't include any illegal charges. There's no illegal consideration. I want to ask one question. In your brief, you ask that this Court award sanctions. You concede we can't do that under Rule 11? I don't even think it's a close call, because this is a dispute. Do you concede we can't do that? You cannot do that? You can't order sanctions, but you can order them to show cause why they shouldn't be ordered? Well, in the procedural posture of this case, do you believe that this Court can award sanctions? Do I? Yes, because I've been fighting this situation for five years. Well, I know you want them. I'm just looking for a procedural basis for us. It doesn't look like you get it right. Okay. All right. Thank you. Thank you. Very briefly. So there's no question that it's de novo review for the illegality, and there's no question that the interest payments were illegal. On the issue of the fraud, what Judge Alsop based the decision on is not what's at issue here. What's at issue is what the Hilers based their decision on. That's the fraud, and it keeps getting misrepresented what that basis is. And I think the fraud is this statement, and it's a clear statement of fact. We never make consumer loans. And if they made a true statement, the qualifying language that they were required by law to include that makes that statement true, except we made one to the Hilers, then the Hilers enter into a very different settlement agreement, if at all. But we don't know what they would have done because there was fraud. Okay. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Sierra Forest Products v. Salazar. Good morning, Your Honors, and may it please the Court, Damian Schiff for the appellant Sierra Forest Products. The candidate listing for the Pacific Fisher is illegal because the service failed to explain why the fisher constitutes a single species rather than three subspecies across the North American continent. And that failure to explain is significant both legally and as a practical matter because the service's distinct population segment listing analysis hinges in large measure on the resolution of that taxonomic question. Specifically, the DPS policy that the service operates under at times refers to the species, quote, of which the population is a part, and at times refers to the taxon of which the population is a part. The fact that it uses species at one time and taxon at the other, we believe evinces a clear intent that the precise taxonomic structure of which the population is a part is significant to the DPS analysis. Here, the service in the candidate listing document rehearsed a significant and multi-decade dispute over whether the fisher constitutes a single species rather than three subspecies. And yet the service never explains why it impliedly, as it argues now, concluded that the fisher constitutes a single species. That failure to explain is, as I mentioned, legally significant and also is a direct violation both of the APA and the general obligation to explain agency decision-making, but also a specific violation of the ESA, which specifically requires. If assuming that the fisher is, in fact, divisible into subspecies, would that necessarily change the government's ultimate finding that the specified range is eligible for protection under the ESA? It may very well, Your Honor, in part because the service would then have the obligation to reanalyze whether the subspecies of which the given population is a part has that same distinctness and significance qualities to it that the service found with respect to the overarching species. As I mentioned, the DPS policy implies that depending upon whether the population is a part of just one large species or rather a part of a smaller subspecies is a significant biological element in the analysis. Now, at this point, it would be impossible to say definitively how the service would come out, but I think at the very least it's a reasonable assertion to say that the outcome might very well be different. And that just further buttresses the practical significance of this taxonomy finding that the service must make. Well, is there – can you cite any law requiring the Forest Service to make an explicit determination as to a species taxonomy when ruling on a petition for listing? Your Honor, the most specific statutory provision in point is the ESA itself, which limits the service's listing power to certain units, specifically three units. Species – Do I have to make some inferences from that? Your Honor, the only inference that we believe the Court would have to make is the fact that Section 4 of the Act gives the power to the Secretary or to the service to list species, and Section 3 of the Act defines species as three separate things, either a species, subspecies, or a DPS, a distinct population segment of a species. Those two subdivisions combined create the clear limitation on the service's listing power to those three units, and therefore, the taxonomy finding is not just simply a matter of academic exercise, as the service would assert, but rather goes to the very heart of the service's statutory jurisdiction. Right now, the way that this has come out, nothing really – there's no change for you in terms of – but it's the first step in what you're seeing to be an inevitable listing? Well, Your Honor, it is the first step in that if the service does finally explain why it chose species versus subspecies, if, in fact, that is the decision that it made, then that may set up a future lawsuit challenging the merits of a candidate listing for the fisher. At this point, though, Sierra Forest Products, with the rest of the regulated public, is entirely in the dark. The only thing that the regulated public has to go on is simply the bald conclusion of the service that there is a single species, but no explanation, and therefore, no power for anyone, including Sierra Forest Products, to understand, let alone to challenge, the bases for which the fisher population is offered for listing. It's that basic inability to understand what the service has done which goes to the very heart of the service's obligation to explain its decision-making. It's not enough for the service really to produce the conclusion. It has to explain the conclusion, and that unquestionably has not happened. You can scour the entire candidate listing document. There is absolutely no explanation why the service, if it did, implied they found that the fisher is a single species. As I mentioned previously, Your Honors, that conclusion is also significant because the outcome of the DPS analysis on remand might very well lead the service to conclude that the fisher does not qualify as a DPS or that the fisher should not be listed at all. So it's not simply a matter of litigating this case in order to set up a future lawsuit. It may very well be that the service, in its discretion on remand, might never decide to proceed with another candidate listing, in which case Sierra Forest Products would receive full redress for its injuries. If the Court has no further questions, I'd like to reserve the balance of my time. Thank you. You may reserve. Thank you. May it please the Court, I am David Shilton representing the Fish and Wildlife Service. With me at council table is Greg Laurie representing the Defendant Intervenors Center for Biological Diversity et al. Mr. Laurie will not be presenting arguments, but is here to answer any questions the Court may have for the intervenors. The district court here found that the service did not need to resolve whether the fisher species might be divisible into subspecies in order for the service to recognize a distinct population segment of the fisher species. That holding should be affirmed because there is nothing in the statute or other source of law that requires the service to resolve the subspecies issue. And in fact ---- Well, let me ask you this, though. If assuming that the fisher is, in fact, divisible into subspecies, wouldn't the Forest Service have to reevaluate the DPS assessment so that it compared the DPS not to the species as a whole, but to the relevant subspecies? No, Your Honor. I think that if the fisher had recognized subspecies, I think the Fish and Wildlife Service would still have the discretion to decide to evaluate whether there was a distinct population segment of the species as a whole. I don't think there's any requirement that it evaluate whether it's a distinct population segment of a subspecies, although it could also do that. I think that the statute affords a lot of discretion to the Fish and Wildlife Service to decide how to proceed when it is focusing on these subclassifications. And the statutory language defines species to include subspecies or ---- and a distinct population segment. There are two alternative ways to focus on subclassifications. Well, I'm understanding the appellant to be saying that if it was, in fact, divisible into subspecies, that that would change the ultimate finding regarding the DPS's eligibility for protection under the ESA, if I'm understanding his argument. I think that that is the argument. So would that change? No. No, because the service could still determine that the best analysis here would be to look at whether this West Coast group is a distinct population segment of the species as a whole. There's no requirement that it only focus on whether it's the distinct population segment of a subspecies. But I think it's also important to stress here that the service has never recognized subspecies with the Fisher. This is just something that has been suggested by some scientists. Other scientists disagree and say, no, there's really not enough evidence to recognize subspecies. Now, when you say there's not, with the scientific debate, is that as to whether or not there really is a distinct subspecies, or is that as to whether or not there's a subspecies that may be in trouble? It's the former. Subspecies is a biological concept and requires some sort of genetic difference to subdivide the species, and biologists argue about that a lot. But what Congress did here is it gave the service an alternative to that biological morass, an alternative that's not recognized in biology, but it's a legal concept, a And so the service uses that a lot more than it does subspecies because you get these abstract debates. I assume that the government concedes that this can be challenged at this stage with it just being on the candidate list. Is that correct? We've not appealed the district court's decision on that. We're not challenging that, no. You did argue that down below. We did argue. You argued that and standing and all of that, but you're not appealing that. We're not appealing on those issues. Well, just as a practical matter, I think I can understand the legal argument, but just as a practical matter, if there is a distinct population that is in trouble, why, as a practical matter, would the service not want to protect it? Well, the reason What's really going on here? What's really going on is that there are a lot of species that parties have petitioned to be protected. The Fish and Wildlife Service has limited resources, and so Congress gave it the ability to make this finding that listing would be warranted but is precluded by the need to address higher priority species first. So when a species is put on the candidate list, it's given a priority number. The fisher distinct population segment is a six. There are, you know, quite a few one, twos, and threes that the Fish and Wildlife Service has to address first. Is it a fate? You know, obviously that, you know, we get people engaged on this, and these are people that do timber, but the fishers are in the canopy, and I think that they were claiming that maybe people won't want to contract with them because they're concerned about what will happen and then that they might not be able to do it. So is it a fate-autcomplete once you get to, if you're classified in this, you know, in this status that the fisher has been, is it a fate-autcomplete that they're going to be threatened or endangered? No. That they'll be on the list? No, because new information can come up, and that new information might indicate that it should move up the priority list, or it might indicate that, in fact, this DPS is not threatened. So it's not a fate-autcomplete. Yeah, but it's the first step. Yes, it is. It is the first step, and we've not challenged the standing holding basically based on the fact that, you know, other elements of the government look at the fact that this is a candidate species, and that might have some effect on timbering. So we're not challenging that. We're simply saying that the district court was correct here that this whole debate about whether the fisher may be a subspecies, it has nothing to do with this alternative way of looking at a subclassification, this distinct population segment, and that if there's any ambiguity about that, it's resolved by the joint policy that the Fish and Wildlife Service and National Marine Fishery Service came up with in 1996. It's on DPSs, and this court said in the Northwest Ecosystem Alliance case that the services have been delegated the authority to resolve those ambiguities, and that's entitled to Chevron deference, and that policy speaks to the issue here today. It says, quote, the authority to address DPSs extends to species in which subspecies are recognized, since anything included in the taxon of lower rank is also included in the higher ranking taxon, end quote. So certainly if there's authority to address, the DPS authority extends to species in which subspecies are recognized, it certainly extends to species where subspecies have just been suggested as here, so even if there exists a West Coast subspecies of fisher, the members of that hypothetical subspecies are included in the higher taxonomic category, that is the species, and as the joint DPS policy says, since they are included in the species, the Fish and Wildlife Service has the authority to address the DPS of the species, and that's what the Fish and Wildlife Service did here. They were clear that they were looking at whether this was a DPS of the species of fisher, they made the comparisons, is it discrete in comparison to the species as a whole, is it significant, they found that it was on both counts, they explained that fully, and the appellant has not challenged those findings, hasn't challenged whether the Fish and Wildlife Service used the best available science. They've simply said that the Fish and Wildlife Service had to resolve this debate, this scientific debate about whether they're subspecies, but that just doesn't go to anything that the service needed to decide here. Are there any further questions? Thank you very much, Your Honor. Your Honor, just two small points, the first being that assuming that the service has the authority after remand to list the fisher as it currently is, it doesn't change our significantly different, would be affected in a different manner based upon this taxonomic question. So it is true that if the service does conclude that the fisher constitutes a single species, then of course it can list a DPS of that species, but our contention is that the plain language of the service's own DPS policy makes the resolution of the taxonomic question essential to determine whether there is even a listable population unit to begin with. And so it's not simply a question of whether we have a DPS of a subspecies or a DPS of a species ultimately. It goes to the heart of the DPS constitution itself. And then with respect to injury, I would just want to direct the Court's attention to the fact that the existing candidate listing has resulted in essentially the overturning of existing timber forest contracts that Sierra Forest Products has that were essentially put in abeyance because of the candidate listing and requiring the Forest Service to do a new NEPA analysis. Where are these forests? I'm sorry, Your Honor. Where are the forests? I believe it's the Sequoia National Forest where these particular timber contracts were issued. Thank you, Your Honors. Thank you. The case just argued is submitted for decision.
judges: Lynn, Schroeder, Callahan